574 So.2d 1306 (1991)
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Plaintiff-Appellee,
v.
Joachim Richard CHACHERE and Helen B. Chachere, et al., Defendants-Appellants.
Nos. 89-822, 89-823.
Court of Appeal of Louisiana, Third Circuit.
February 7, 1991.
Rehearing Denied March 8, 1991.
Frederick J. Fuselier, Asst. Gen. Council, Baton Rouge, Bertrand & Soileau, Ronald J. Bertrand, Rayne, Fournet & Adams, Robert J. Adams, Lafayette, for plaintiff-appellee.
Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Steve B. Rabalais, John G. Torian II, Lafayette, for defendant-appellant.
Broadhurst, Brook, Mangham & Hardy, Robert L. Ledoux, Baton Rouge, Sidney J. Zeller, Gregory L. Landry, Davidson, Meaux, Sonnier, McElligott & Swift, James J. Davidson III, Lafayette, for defendants-appellees.
*1307 Before GUIDRY, STOKER and DOUCET, JJ.
STOKER, Judge.
The issue in this case is the amount of compensation due Lamar Advertising of Lafayette (Lamar) for the loss of two billboard signs and two leaseholds through expropriation by the State, Department of Transportation and Development (DOTD). Lamar contends on appeal that the jury award is inadequate. In order to consider whether the award is adequate or inadequate, we must first identify the method through which the compensation should be determined.

FACTS
On September 14, 1984, the DOTD expropriated a parcel of land from Joachim Chachere, together with all improvements and buildings thereon, in order to construct a railroad overpass over University Avenue in the City of Lafayette. On January 20, 1985, the DOTD expropriated a parcel of land from the Southern Pacific Transportation Company, together with all improvements, for the same purpose. As a result of the project, traffic on University Avenue now passes underneath the railroad tracks rather than having to cross the tracks themselves as it previously did.
Prior to the expropriation, Lamar had leaseholds at the expropriated Chachere and Southern Pacific sites for the purpose of billboard advertising. Under the terms of both leases Lamar owned the billboard structures and had an obligation to remove the structures upon termination of the leases. Neither lease contained a clause providing for automatic termination of the lease upon expropriation of the property by the State.
The DOTD expropriated Lamar's billboards and the property leased by Lamar pursuant to the "quick taking" provisions of LSA-R.S. 48:441, et seq. The DOTD deposited $3585 into the court registry for the Chachere billboard and $4762 for the Southern Pacific billboard. Lamar answered, contending the amounts deposited by the State were inadequate compensation for loss of the advertising locations. Lamar has not sought consequential damages such as loss of profits.
The suits involving the Chachere and Southern Pacific properties were consolidated for trial. The State, DOTD, settled with Chachere and Southern Pacific prior to trial, leaving only the issue of Lamar's damages to be tried. The jury awarded Lamar $8373.10 for the Chachere location, $7740 for the Southern Pacific location, $1916.52 attorney fees and $1500 expert appraisal fees. Lamar appeals the judgments contending the amounts awarded are inadequate. We affirm.

OPINION
It is clear that the two jury awards are based solely on the replacement cost of the two physical sign structures. This is so because the only evidence on replacement cost of the physical structures came through the testimony of the appellant's (Lamar's) expert, Mr. Maurice Chappuis. DOTD produced no evidence regarding replacement cost, and Chappuis was the only expert who testified for Lamar concerning what Lamar lost through the taking by the State through DOTD.
The basis of Lamar's appeal is that (1) the replacement cost consists alone of the cost to reconstruct and does not take into account the value of the outdoor advertising locations, and (2) the proper compensation to Lamar should be based on the fair market value of the locations. Mr. Chappuis testified that the fair market value of the Chachere and Southern Pacific leases was $17,022 and $13,431 respectively.
In this appeal DOTD takes the position that the jury's awards are supported by the record and are for the exact amounts found by Lamar's expert, Chappuis, to be the replacement cost new for the expropriated structures. DOTD urges that the record fails to disclose that leases at two new sites in Lafayette would be more expensive than the two expropriated lease sites expropriated. Therefore, DOTD contends that nothing needs to be included in Lamar's compensation for the cost of acquiring new sites. In effect DOTD takes the position *1308 that the jury could properly conclude that Lamar could put itself in the same position in which it had prior to the expropriation by simply acquiring new sites by lease. DOTD also contends that the record establishes that such sites, as good as the sites involved here, were available.
This expropriation case is somewhat unusual in one respect in that the trier of fact had the benefit of the testimony and opinion of only one expert appraiser. As we pointed out above, this was Mr. Maurice Chappuis. Under the circumstances we have only Mr. Chappuis' testimony to focus on in this appeal. We proceed to analyze the method by which Chappuis reached his appraisal.
Actually, Chappuis made three approaches to his appraisal, selecting the one he thought was the most valid. The three approaches were: (1) the cost approach for the replacement cost of the sign structures only, (2) the market data approach which compares sales of similar outdoor advertising location leases (including a sign structure), the price of which is determined by mathematically factoring in the gross income from the sign for the prior 12 months, and (3) the income capitalization approach which translates future net income from the sign itself (estimating the return an investor would expect on his money) into a present worth value.
Mr. Chappuis settled on the second of the listed approaches, the market data approach, and assigned the value of $17,022 and $13,431 as the values of the "properties" taken from Lamar in the expropriation. In this appeal Lamar urges that the jury should have awarded these amounts. Instead, the jury awarded the amounts which Chappuis arrived at through the cost approach which was $8373.10 and $7740. Through the income capitalization approach, Chappuis arrived at figures close to but slightly higher than those arrived at through the market data approach. As noted above, Chappuis settled on the market data approach figures.
Lamar vigorously contends in this appeal that both the trial judge and the jury erred and that we should correct these errors on appeal. To do so Lamar urges that we should increase the awards upward to the market data figures given by Chappuis. The error which Lamar assigns to the trial judge relates to a portion of his jury instructions concerning the fair market value approach in expropriation matters. We find it unnecessary to address this assignment.
If we should find that the method by which Mr. Chappuis arrived at his "market data figures" is a valid approach, we should simply amend the jury award without excessive discussion of the alleged erroneous jury instructions or elaborate consideration of the constitutional arguments set forth on Lamar's behalf. Lamar's counsel assumes the validity of the Chappuis method of valuation of "market value" and then begs the question by urging error in the trial judge's jury instructions which he claims raise constitutional questions.
The determining question as we see it is whether the Chappuis method of arriving at an opinion as to "market value" is appropriate as a measure for compensation in an expropriation case. We accept the testimonial evidence that Chappuis' method is accepted within the industry for certain purposes. We have not found any case in which this method has been applied in expropriation cases. It should be observed in setting the stage for our considerations that we are dealing here with two kinds of property: the ownership of the physical property consisting of the signboards themselves (for which the jury awarded compensation in the amount fixed by Chappuis) and the leasehold rights to display advertising at the two sites in question through use of the signboards. In this appeal Lamar contends that market value should encompass both the value of the physical property taken and the loss of the leasehold right to display outdoor advertising.
Much of the discussion of fair market value in expropriation jurisprudence relates to physical property in land and physical structures upon it. The jurisprudence also contains cases establishing methods for valuation of the loss sustained by lessees *1309 who lose their leaseholds in a taking of the physical property through expropriation. None of this jurisprudence provides any support for applying the method of valuation followed by Mr. Chappuis.
In order to set forth the method followed by Mr. Chappuis, which he testified was based on comparable sales, we quote liberally from a reply brief submitted by Lamar to this court:
"Review of the record will reveal an abundance of evidence which justified Mr. Chappuis' comparable sales approach. Mr. Charles Lamar and Mr. Jerry Marchand, both of the Lamar Corporation, testified to the existence of a market for outdoor advertising properties. (Record, Volume II of III, pp. 281, 294.) In addition to these two witnesses, Lamar offered the testimony of Mr. Norman Glindmeyer. The Court accepted Mr. Glindmeyer as an expert in the practices and customs of the outdoor advertising industry. (Record, Volume III of III, p. 351.) Messrs. Lamar, Marchand, and Glindmeyer all testified that the outdoor advertising industry values these properties, and therefore buys and sells them, on a `gross income multiple' basis. The gross income for the preceding twelve months is determined and that figure is multiplied by a multiple of three to five, depending upon a variety of factors. (Record, Volume II of III, pp. 243-244, 293-294; Record, Volume III of III, pp. 355-356.) This is the precise method which Mr. Chappuis, the appraiser, used to calculate the properties' fair market value under the comparable sales approach. (Record, Volume III of III, p. 396.)
"The State stipulated to the accuracy of the figures utilized by Mr. Chappuis for gross income. (Record, Volume III of III, p. 450.) Mr. Chappuis used a `conservative' multiple of `3' despite the fact that similar locations were sold in the Lafayette area in May of 1984 for a multiple of 3.53. (Record, Volume III of III, pp. 398-400.)
"By utilizing the `comparable sales' approach to appraisal, Mr. Chappuis determined the fair market value of the outdoor advertising locations on the Chachere and Southern Pacific properties to be $17,022.12 and $13,431.69 respectively. (Record, Volume III of III, pp. 402-403.) Again, this is nearly double the figures which this jury actually awarded.
"It should be further emphasized that Mr. Chappuis' expert opinion on fair market value was corroborated by the `income capitalization' method of appraisal. Mr. Chappuis explained that this analyzes the value of business property by focusing on net income, rather than the gross income figures which are utilized in the `comparable sales' approach. Mr. Chappuis testified that he again used `conservative' figures on both net income and a capitalization rate and derived highly similar figures of $17,458.53 on the Chachere lease and $13,776.07 on the Southern Pacific lease. (Record, Volume III of III, pp. 404-408.)
"Mr. Chappuis, therefore, performed an appraisal in the precise manner which the law dictates. He placed his primary reliance upon a `comparable sales' analysis. (Record, Volume III of III, p. 409.) He effectively corroborated this figure by use of the `income capitalization' approach. Furthermore, he performed the third method of appraisal, the `replacement cost' analysis, and found it to be inapplicable because of its inability to account for many of the factors which comprise Lamar's loss in this case. All of these facts are prominent in the record. This Court should rightly be taken aback by the very suggestion that the jury verdict can somehow be affirmed by relying upon portions of Mr. Chappuis' testimony."

* * * * * *
"The undisputed facts of this case are that Lamar has been deprived of two valuable outdoor advertising locations on University Avenue in Lafayette. The uncontradicted testimony of the expert appraiser, Maurice Chappuis, was that the highest and best use of this property was to utilize it as an outdoor advertising property. Not only Lamar's employees, Charles Lamar and Jerry Marchand, but *1310 also the expert on outdoor advertising practices and customs, Norman Glindmeyer, testified that there is a market for such properties and that it is an industry standard to value these locations by determining the gross income of each particular structure for a twelve month period and then multiplying this figure by a multiple ranging from 3 to 5. This is how the entire industry values its locations. Mr. Chappuis looked to both the `comparables sales' and the `income capitalization' methods and arrived at a fair market value for these property."
We accept the testimony of Lamar's witnesses to the effect that the "gross income multiple" formula is widely used in the outdoor advertising industry. This formula no doubt has a utility for business experts in that industry. We will assume that the "comparable sales" which Mr. Chappuis says he used for his comparable sales approach are valid. Nevertheless, it may be seen that there is some indirection in this mode of appraisal. It is not clear just what "sales" is meant to convey. Are they exchanges between different companies in the advertising business or does "sales" refer to the transactions with advertisers who place their messages on the billboards. In appraising the fair market value of land taken, real estate appraisers customarily use the comparable sales approach and adjust their data with what might be called modifiers. However, such appraisals are directly related to sales of similar properties and do not involve the introduction of income from the land.
If we look to methods approved by the courts of this State for fixing the compensation to be paid to lessees of physical facilities who lose their leases because of an expropriation, we find nothing suggestive of a "gross income multiplier." In fact, we find that all such cases rest upon the proposition that a lessee is entitled to compensation only if he can establish that the present value of the lease is greater than the rental which the lessor agreed to accept. If there has been no appreciation in value, then the lessee is entitled to nothing. This principle is premised on the ability of the lessee to acquire comparable lease facilities at the same price. If this cannot be done and the lessee proves that he will have to pay more for new facilities, he is entitled to the difference between what he formerly paid and what he must now pay. This difference is referred to as "lease advantage" or "economic rent" and is the amount which the lessee should be awarded as compensation for the taking. For discussion of these principles, see State, Dept. of Hwys. v. Ferris, 227 La. 13, 78 So.2d 493 (1955); Illinois Cent. Gulf R. Co. v. International Harvester Co., 405 So.2d 545 (La.App. 4th Cir.), writ denied, 407 So.2d 731 (La.1981); State, Dept. of Hwys. v. Maggio, 399 So.2d 716 (La.App. 1st Cir.1981); State, Dept. of Hwys. v. Champagne, 371 So.2d 626 (La.App. 1st Cir.1979), rev'd. on other grounds, 379 So.2d 1069 (La.1980); State, Dept. of Hwys. v. Hayward, 338 So.2d 1171 (La.App. 2d Cir.1976); State, Dept. of Hwys. v. LeBlanc, 319 So.2d 817 (La.App. 1st Cir. 1975); Comment, "Expropriation-Compensable Items in Louisiana," 24 La.L.Rev. 849, 874 (1964).
While the jurisprudence appears to give approval to some type of income approach involving comparables, it has disapproved of "mathematical" factors applied to valuations in order to permit "an acceptable return on investment." Illinois Cent. Gulf R. Co. v. International Harvester Co., supra.
The "gross income multiple" applied in this case is a factor arrived at with respect to given properties by dividing gross income into sales price. This generally yields a figure (the factor) of between three and five. Mr. Chappuis considered comparable outdoor advertising leases in Lafayette in his market data approach. In so doing he concluded that such leases generally indicated a gross income multiple of three. Therefore, he concluded that the two Lamar leases should have a gross income multiple of three. The gross income from the Chachere lease for the selected 12-month period was $5674.04. Multiplying three times this figure yielded the figure of $17,022.12 as the market value Chappuis assigned to the Chachere lease. The gross *1311 income for the Southern Pacific lease was $4477.23, which when multiplied by three yielded the figure of $13,431.69. (Mr. Chappuis rounded these figures off.)
In the income capitalization approach Mr. Chappuis assumed what a prudent investor would want as income. In this approach net income is the starting point. Mr. Chappuis estimated that expenses in the advertising business will run between thirty and sixty percent of gross income. In this case he selected sixty percent to arrive at a net income. He capitalized this figure using thirteen percent as the amount an investor would want as a return on his money. The figures arrived at by this method were close but slightly higher than those arrived at through the gross income multiplier approach.
Neither of the Chappuis approaches just discussed makes direct comparisons with other rentals. There has been no focus in this case, either from Lamar or the State, on what Lamar was paying for its leases and what it might have had to pay for other lease locations in Lafayette of equal desirability. Lamar resists this idea altogether and insists on focusing on the value of the two leases considered indirectly, primarily through the gross income multiplier. Lamar appears to take the position that the two leases were virtually irreplaceable because they were so uniquely located. In making this approach Lamar has made no effort to establish a loss of lease advantage or economic rent by showing that new comparable leaseholds cost more than the Chachere and Southern Pacific leasehold.
In our view the gross income multiplier approach does not accord with the traditional mode of valuing leaseholds which we find in the jurisprudence. Accordingly, we reject this approach and approve the jury findings in this case. Where land itself is taken in an expropriation, the landowner receives the value of his property in exchange for the property, and he can invest it as he pleases. The jurisprudence relating to the taking of leasehold appears to rest on the proposition that the lessee holds the property leased or rented for the payment of a stipulated sum for a period of time. Interruption of the lease interrupts the obligation to pay rent for the remainder of the term. The lessee who acquires a new lease pays to the new landlord what he formerly paid to the lessor, or perhaps, pays more or less. It is obvious in this case that the jury based its findings on this concept. It had before it no showing that new leases would cost more than the two leases involved in the taking. Under the circumstances, the jury evidently felt that by awarding Lamar the cost of the physical signboard structures Lamar was in a position to shift to other locations and be made whole.
Lamar vehemently contests the idea that it could move to other locations in Lafayette and thus be put in a position as good as it was before the taking. However, there was very credible evidence, including testimony from Lamar's own witnesses, that this was so. Without detailing the evidence, it appears to us that this was a matter which the jury could decide as it did and we do not find that it manifestly erred. Finally, we note that although the gross income multiple approach in valuation of outdoor advertising locations is evidently accepted and acted upon within the advertising industry, that fact does not necessarily bind the State in an expropriation matter. As the jury's approach appears to have followed jurisprudentially established methodology and is supported by the evidence, we affirm its finding and the judgment of the trial court based on the jury verdict.
For the foregoing reasons, we affirm the judgment of the trial court. The costs of this appeal are assessed to the appellant, Lamar Advertising of Lafayette.
AFFIRMED.